In re **VICTORIA CORPORATION OF TAMPA, Fletcher Regency Associates, Ltd., Bloomingdale Corporation of Tampa, Inc., 51st Street Station, Inc.,** Debtors.

**Bankruptcy Nos. 90–0068–8P1, 90–0071–8P1 through 90–0073–8P1.**

United States Bankruptcy Court, M.D. Florida, Tampa Division.

Oct. 1, 1990.

Arnold D. Levine, Tampa, Fla., for debtors.

Linda A. Conahan, Ft. Lauderdale, Fla., for movant.

## ORDER ON MOTIONS TO DISMISS

ALEXANDER L. PASKAY, Chief Judge.

THIS CAUSE came on for hearing with notice to all parties in interest upon submissions entitled Third Motions To Dismiss and Notices of Default in Adequate Protection (Motions), filed by Glendale Federal Bank, F.S.B. (Glendale), in each of the above-captioned Chapter 11 cases. Through the Motions, Glendale contends that these cases should be dismissed and, in the alternative, that the automatic stay should be lifted to permit Glendale to foreclose its mortgages on these Debtors' primary assets, apartment complexes located in Hillsborough County, Florida, based on the Debtors' alleged failure to comply with certain Orders of this Court. The facts relevant to the resolution of the Motions as established at the final evidentiary hearing are as follows:

It is undisputed that the Debtors are indebted to Glendale by virtue of promissory notes in the aggregate original principal amount of $12,700,000.00 secured by first mortgages (Mortgages) executed by the Debtors in favor of Glendale, encumbering property owned by Victoria Corporation of Tampa (Victoria) known as Polo Run Apartments; property owned by Fletcher Regency Associated, Ltd. (Fletcher), known as Fletcher Regency Apartments; property owned by Bloomingdale Corporation of Tampa (Bloomingdale) known as Palm Apartments; and property owned by 51st Street Station, Inc. (51st Street), known as 11305 51st Street North.

The record reveals that in April of 1989, the Debtors defaulted under the terms of the Notes and Mortgages. In order to prevent foreclosure of the properties, the Debtors through Mr. Vincent Bekiempis (Bekiempis), president of Victoria, Bloomingdale and 51st Street, and general partner of Fletcher, entered into negotiations with Glendale for the modification of existing obligations. Specifically, the Debtors sought a modification of the Notes' interest rates and a provision for a future advance funding to the Debtors. After extensive negotiations, Glendale and the Debtors had established the terms of the modification, which included an interest rate reduction, a future advance for payment of real estate

taxes to be secured by a cross-collateralization of Palm Plaza, Polo Run, 51st Street Station and Fletcher Regency, together with four other properties owned by entities affiliated with the Debtors and a one-month moratorium.

It appears that representatives of Glendale and the Debtor had at least one telephone conversation whereby Glendale informed Bekiempis that the loan modification had been approved, and on July 27, 1989, Glendale's attorney, Linda A. Conahan, wrote a letter to Bekiempis, which provided:

> Glendale has approved a future advance proposal which must now be put into final documentation. Pending a closing on the loan modification, Glendale is willing to accept your checks in the proposed new loan amounts as a courtesy and our further indications of good faith. However, the loan modification must be closed no later than August 15, 1989. If the modification is not closed by that date, any monies forwarded for the July payment will be applied to past due outstanding balances as they exist of this date, and Glendale will proceed without further notice or demand directly to foreclosure. Acceptance of the first July payment in anticipation of final documentation on the modification is in no way a waiver of any of Glendale's rights. *The terms of all existing loans and the accelerations which have occurred remain in full force and effect until such time as loan documentation has been finalized and executed.* If you are in disagreement with any provision of this letter, please contact me immediately.

(emphasis added) (Debtors' Composite Exh. 1(R)).

There is no doubt that Glendale consistently informed the Debtors that it was not waiving any of its rights under the loan documents, that there was no guarantee of a loan modification agreement, and that a closing was a condition precedent to the loan modification becoming final. (Glendale's Exh. 1; Debtors' Composite Exh. 1(E), (I), (J) and (R)).

On July 31, 1989, Bekiempis notified Glendale that he believed it would be impossible for the closing to occur on August 15, 1989, as he had not yet received the loan modification documents for review. (Debtors' Composite Exh. 1(S)). On August 15, 1989, Glendale notified Bekiempis that its attorneys had determined that the future advance could not be cross-collateralized, apparently because of Glendale's discovery of numerous judgment liens against the properties and stated that Glendale was still willing to work with the Debtors and made a new modification proposal. (Debtors' Composite Exh. 1(T); Glendale's Exh. 3).

It is undisputed that no closing occurred on August 15, 1989, or any time thereafter and despite further negotiations, on August 25, 1989, Glendale notified Bekiempis that it was not possible to mutually agree on a method to restructure the loans and that all negotiations were terminated. (Debtors' Composite Exh. 1(U)).

On January 4, 1990, the Debtors filed their voluntary Petitions of Relief under Chapter 11 of the Bankruptcy Code. Upon learning of the Debtors' bankruptcy filings, on March 2, 1990, Glendale filed Motions for Relief from Automatic Stay, to Prohibit Use of Cash Collateral, and for Sequestration of Rents and Profits, seeking an order authorizing Glendale to foreclose its mortgages, or, in the alternative, directing the Debtors to provide Glendale with adequate protection of its interests. This Court subsequently entered Orders denying the Motions, but granting Glendale adequate protection payments "in an amount equal to the regular contractual payment on a monthly basis beginning May 1, 1990", and ordering the Debtors to cure all postpetition arrearages on or before May 1, 1990. There is no dispute that the regular contract payments due under the terms of the Notes as executed were $19,531.68 for Victoria; $33,103.68 for Fletcher; $43,015.64 for Bloomingdale; and $33,241.00 for 51st Street.

It appears that the Debtors failed to make the regular contractual payments as called for under the written terms of the

Notes and Mortgages, but instead made payments in reduced amounts. On or about May 3, 1990, Glendale filed affidavits stating that the Debtors had failed to comply with this Court's prior adequate protection Orders, and on May 22, 1990, filed the Motions under consideration. In due course, this Court scheduled a hearing to determine whether the Debtors had in fact defaulted under the terms of the adequate protection Orders. While ordinarily it should be fairly easy to determine the existence of a default, the Debtors claim that they have not defaulted under the terms of this Court's Orders as Glendale and the Debtors entered into an oral agreement to modify the Notes and Mortgages to lower the regular contract payments due and thus, the "regular contract payments" required to be paid in this Court's Orders should be determined according to the oral modification of the Notes and Mortgages.

■ Thus, the essence of the dispute is the existence or nonexistence of a valid oral modification to the Notes and Mortgages. It should be noted at the outset that the statute of frauds does not bar a suit for specific performance of an oral modification of a note and mortgage. *See Howdeshell v. First National Bank of Clearwater,* 369 So.2d 432, 434 (Fla. 2d DCA 1979); *Martyn v. First Federal Savings and Loan Assoc. of West Palm Beach,* 257 So.2d 576, 580 (Fla. 4th DCA 1971). However, if it is clear that a party signifies an intent that a contract will not be binding until it is expressed in a writing and signed by the parties to the contract, then he will not be bound by the original contract until the agreement to modify same is in fact in a signed writing. "If it [the written draft] is viewed as the consummation of the negotiation, there is no contract until the written contract is finally signed." *Rock v. Las Olas Co.,* 156 Fla. 510, 23 So.2d 839, 843 (1945) (citations omitted). *See also Ocala Cooperage Co. v. Florida Cooperage Co.,* 59 Fla. 390, 52 So. 13 (1910).

■ A careful review of the evidence reflects that although there was a general agreement regarding the terms of the proposed modification between the Debtors and Glendale, there was always a full understanding that the modification would not be final until a closing occurred. The July 27 letter from Conahan to Bekiempis (Debtors' Composite Exh. 1(R)) repeatedly emphasized that there was no enforceable contract until a closing of the loan modification occurred. The letter stated that the proposal had to be put into final documentation and Glendale was only accepting checks in the proposed new loan amounts as a courtesy and indication of good faith. Glendale made it clear that its acceptance of the first July payment in anticipation of final documentation on the modification was in *no way a waiver of any of Glendale's rights.* It is likewise clear that Glendale insisted that the terms of all existing loans and the accelerations which have occurred remained in full force and effect *until such time as loan documentation has been finalized and executed.* Finally, the letter explained that if Bekiempis was in disagreement with *any provision* of the letter, he was to contact Conahan immediately. There is no evidence in this record to show that the Debtors ever expressed disagreement with the requirement that a closing take place before the proposed modification became effective.

Based on the foregoing, this Court is satisfied that although the modification may have been approved in general terms, this approval is immaterial to the ultimate conclusion of this matter as Glendale consistently communicated to Bekiempis its intent that the negotiations culminate at closing, and that without a closing, there was no contract.

■ To avoid the foregoing conclusion, the Debtors contend that because Glendale failed to provide the Debtors the closing documents in time for the August 15, 1989, closing date, it cannot take advantage of its own wrongdoing to avoid responsibility under the terms of the partially performed oral modifications. However, there was no partially performed oral modification. Although Glendale accepted the July payment under the proposed agreement, it expressly stated that acceptance was not a waiver of

Glendale's rights. Because Glendale communicated an intent not to be bound until closing, no amount of negotiation or oral agreement to specific terms resulted in the formation of a binding contract. *Winston v. Mediafare Entertainment Corp.*, 777 F.2d 78, 80 (2d Cir.1985) (*citing R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 74 (2d Cir.1984)).

 The Debtors also contend that the relationship between Glendale and the Debtors was confidential and fiduciary and that Glendale had a duty to disclose that the cross-collateralization and the execution of loan modification documents were conditions precedent to the existence of a binding obligation. However, the Debtors have not proven that the relationship was anything other than an arms-length relationship of a lender and borrower. Further, this Court is satisfied that the Debtors knew that Glendale insisted on a total cross-collateralization of all the properties to provide additional security for its outstanding loans and intended that a closing reflecting that this proposition would be incorporated in the contract take place before the modification became final.

Notwithstanding the foregoing conclusion that no oral modification existed, this Court is satisfied that the Debtors should be allowed a short period of time within which to cure all defaults under the previous Orders entered by this Court granting adequate protection. Therefore, the Motions should be denied without prejudice based on the Debtors' providing adequate protection to Glendale in addition to curing all postpetition defaults.

Accordingly, it is

ORDERED, ADJUDGED AND DECREED that the Third Motions To Dismiss be, and the same are hereby, denied without prejudice conditioned upon the terms and conditions outlined below. It is further

ORDERED, ADJUDGED AND DECREED that the Debtors shall cure all postpetition arrearages based on the regular contractual payments as set forth in this Order within thirty (30) days of the date of the entry of this Order. It is further

ORDERED, ADJUDGED AND DECREED that the terms of this Court's prior Orders granting Glendale adequate protection shall remain in full force and effect and thus, Victoria Corporation of Tampa shall make adequate protection payments in the amount of $19,531.68 per month; Fletcher Regency Associates, Ltd., shall make adequate protection payments in the amount of $33,103.68 per month; Bloomingdale Corporation of Tampa, Inc., shall make adequate protection payments in the amount of $43,015.64 per month; and 51st Street Station, Inc., shall make adequate protection payments in the amount of $33,241.00 per month.

DONE AND ORDERED.